**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| SVV TECHNOLOGY INNOVATIONS INC. | § § § | |
| Plaintiff, | § § | Case No. 6:25-cv-00025-ADA |
| v. | § § | Case No. 6:25-cv-00026-ADA |
| ASUSTEK COMPUTER INC., | § § | Case No. 6:25-cv-00027-ADA |
| | § § | |
| Defendant. | § § | |

**DEFENDANT ASUSTEK COMPUTER INC.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………………………………...1

II.   ASUSTEK'S PROPOSED CLAIM CONSTRUCTIONS…………………...………………1

A. The Claimed Inventions of the '197 Patent Family as a Whole are Limited…………...2

   1.  Relevant Legal Standards…………………………………………………..……..3
   2.  The Inventor Repeatedly Described His Invention As "Face-Lit" Illumination
       Systems "As Opposed To Edge-Lit" Systems…………………………………… …...5

B. "randomized" / "randomized positions within the two-dimensional pattern" /
   "randomized two-dimensional pattern" / "the two-dimensional pattern is random or
   quasi-random"……………………………………………………………… …………7

C. "light coupling element"…………………………………………………………....10

D. "light coupling area"…………………………………………………………..12

E. The Claimed Inventions of the '791 Patent Family As A Whole Are Limited……….14

   1.  The Inventor Repeatedly Described His Invention As A Light Trapping/Collecting
       System, Not An Illumination System……………………………………………….14

F. "quantum dots"………………………………………………………..… …….…….20

G. "band gap" / "bandgap"………………………………………………… ...………22

H. "light trapping [optical] structure"……………………………………….. ………….24

I. "wherein [the]/[a] thickness of the [photoresponsive]/[active] layer is less than a
   minimum thickness sufficient for absorbing substantially all [received light in a single
   pass at normal incidence]/[light in a visible spectrum traversing through the active layer
   in a single pass]" "absorb . . . light" / "absorbing . . . light" "light absorbing
   layer"……………………………………………………………………………….25

   1.  The '791 Patent Family Only Describes "Absorbing" Light To Produce Electrical
       Energy………………………………………………………...……………………..25

J.   "wherein [the]/[a] thickness of the [photoresponsive]/[active] layer is less than a minimum thickness sufficient for absorbing substantially all [received light in a single pass at normal incidence]/[light in a visible spectrum traversing through the active layer in a single pass]"……………………………………………………….27

    1.  Relevant Legal Standards……………………………..……...……………… 27
    2.  The Specification Provides No Objective Boundary From Which A POSITA Could Determine The Scope With Reasonable Certainty………………….……….27

K.  "linear grooves"……………………………………………………………….28

L.  "configured to" / "configured for"…………………………………………….30

M.  "indirectly in contact with"……………………………………….……….....32

N.  "highly transparent optical windows"……………………………………….33

O.  "receive light"……………………………………………………………….36

P.  "substantially smaller" / "substantially greater" / "substantially shorter"………...37

Q.  "planar lens array" / "planar array" / "planar microstructured surface" / "planar surface" / "planar reflective surface"……………………………………….…...40

R.  "focal area[s] / "effective focal area"……………………………….……….41

S.  "focal plane"……………………………………………………….……….42

T.  "optical waveguide"……………………………………...…….……...43

U.  "LED strip" / "flexible side-emitting LED strip"…………………….……...43

V.  "side-emitting LED packages"……………………………………….……..44

W.  "printed circuit"………………………………………………….……….45

X.  "light mixing area"…………………………………...…………….……45

Y.  Whether '088 Patent (claims 1, 3, 7, 8, 10-12, 18-19, 21-22, 24-26) and '089 Patent (claims 1, 2, 4-5, 7-10, 12-14, 16-20) preambles are limiting………………..…45

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*, No. 6:11-CV-011, 2012 WL 2872121, at *12-14 (E.D. Tex. July 12, 2012) ........................................................ 35

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) .................................... 2

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1334 (Fed. Cir. 2011) .................. 4

*Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ......................................... 44

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, No. 11-1147 (Fed. Cir. Mar. 14, 2012) ........... 31

*Barkan Wireless IP Holdings, L.P. v. Sprint Commc'ns Co., L.P.*, No. 2:19-CV-336-JRG, 2020 WL 6271162, at *34 (E.D. Tex. Oct. 26, 2020) ......................................................... 31

*Barrday, Inc. v. Lincoln Fabrics Inc.*, No. 2022-1903, 2023 WL 7871688, at *5 (Fed. Cir. Nov. 16, 2023) .................................................................................................................. 4

*Becton, Dickinson & Co. v. Tyco Healthcare Gr*p., 616 F.3d 1249, 1254 (Fed. Cir. 2010) ........ 11

*Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) ................. 27,34

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ................................. 6

*Cap. Mach. Co., Inc. v. Miller Veneers, Inc.*, 524 F. App'x 644, 649 (Fed. Cir. 2013) ............... 37

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d1361, 1372 (Fed. Cir. 2012) . 3

*Competitive Technologies, Inc. v. Fujitsu Ltd.*, 185 F. App'x 958, 965-66 (Fed. Cir. 2006) ....... 10

*Datanet LLC*, No. 6:22-CV-001142-OLG-DTG, 2023 WL 7545234, at *10 (W.D. Tex. Nov. 10, 2023) .......................................................................................................................... 38

*Driessen v. Sony Music Ent.*, 640 F. Apex 892, 895 (Fed. Cir. 2016) ......................................... 10

*Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ........................................... 3

*ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012) ................................. 27

*Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) ................................ 27

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) .......... 2, 17

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) .................. 31, 36

*Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) ...................... 5

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) ........................... 7

*Indivior Inc. v. Dr. Reddy's Lab'ys, S.A., 752 F. App'x 1024, 1032 (Fed. Cir. 2018)* ……………..2

*Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) .............................. 27

*Jaguar Land Rover Ltd., v. Bentley Motors Ltd.*, No. 2:18-CV-320, 2020 WL 7010227, at *15-18 (E.D. Va. 2020) ......................................................................................................................... 35

*Kaken Pharm. Co. v. Iancu, 952 F.3d 1346, 1352 (Fed. Cir. 2020)* …………………………………16

*Kinik Co. v. Int'l Trade Comm'n.*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ................................... 18

*Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014) ............................................ 27

*Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ............................... 36

*Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) ........................ 4

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*) ...................................... 4

*Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ..................................... 3

*Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ............................ 44

*Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) .......... 4, 7

*Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1003 n.2 (Fed. Cir. 2016) ...................................................................................................................................... 17

*SandBox Logistics v. Proppant Express Invs.*, 813 F. App'x 548, 555-56 (Fed. Cir. 2020) ........ 11

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d1337, 1341 (Fed. Cir. 2001) ......................................................................................................................................... 2

*Selex Commnc's, Inc. v. Google Inc.*, No. 1:09-cv-02927-TWT, 2013 WL 1412334, at *14 (N.D. Ga. Apr. 8, 2013) ...................................................................................................................... 35

*Semcon IP Inc. v. Huawei Device USA Inc*, No. 2:16-CV-00437-JRG-RSP, 2017 WL 2972193, at *24-25 (E.D. Tex. 2017) ........................................................................................................ 36

*Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) ...................................... 16

*Signal IP v. Am. Honda Motor Co.*, No. LACV: 14-02454 JAK JEMX, 2015 WL 5768344, at *53-56. (C.D. Cal. Apr. 17, 2015) ........................................................................................... 35

*SIPCO, LLC v. ABB, Inc.*, No. 6:11-CV-48, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012) ................................................................................................................................................ 32

*Solocron Media, LLC v. Verizon Communications Inc.*, 2015 WL 1011310, *12 (E.D. Tex. March 5, 2015) ............................................................................................................................. 32

*Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998) ............................... 3

*Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1358-59 (Fed. Cir. 2017) ...... 30, 37

*Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) ....................... 3

*TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1345-46 (Fed. Cir. 2013) ................ 36

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ............................. 30

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ...................................................................................................................................... 29

*U.S. Well Servs., Inc. v. Halliburton Co.*, No. 6:21-cv-00367-ADA, 2022 WL 819548, Dkt. No. 74, at *5-10 (W.D. Tex. Jan. 17, 2022) ................................................................................. 35

*Uniloc 2017 LLC v. Verizon Commc'ns, Inc.*, 846 F. App'x 914, 916–17 (Fed. Cir. 2021) ........ 18

*Via Transportation Inc. v. RideCo Inc., No. 6:21-cv-457-ADA* ...................................................35

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ................................ 3

*VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 653 (Fed. Cir. 2022) ............................................. 44

**Statues**

35 U.S.C. § 112

### TABLE OF SVV ASSERTED PATENTS

| U.S. Patent No. (Exhibit No.) | Abbreviation | Cases in which Patent is Asserted[1] |
|---|---|---|
| **'088 Patent Family[2]** | | |
| 10,439,088 (**Exhibit 1**) | '088 Patent | 6:25-cv-00027-ADA ("–0027 Case") |
| 10,439,089 (**Exhibit 2**) | '089 Patent | 6:25-cv-00025-ADA ("–0025 Case") |
| 11,616,157 (**Exhibit 3**) | '157 Patent | –0025 Case |
| 11,923,475 (**Exhibit 4**) | '475 Patent | 6:25-cv-00026-ADA ("–0026 Case") |
| 12,159,951 (**Exhibit 5**) | '951 Patent | –0027 Case |
| **'342 Patent Family[3]** | | |
| 9,880,342 (**Exhibit 6**) | '342 Patent | –0026 Case |
| 10,627,562 (**Exhibit 7**) | '7562 Patent | –0027 Case |
| 10,838,135 (**Exhibit 8**) | '135 Patent | –0025 Case |
| 10,613,306 (**Exhibit 9**) | '306 Patent | –0027 Case |
| 8,740,397 (**Exhibit 10**) | '397 Patent | –0025 Case |
| **'197 Patent Family[4]** | | |
| 10,962,197 (**Exhibit 11**) | '197 Patent | –0026 Case |
| 11,156,340 (**Exhibit 12**) | '340 Patent | –0026 Case |
| 11,821,621 (**Exhibit 13**) | '621 Patent | –0027 Case |

---

[1] Many of these patents are also asserted in *SVV Technology Innovations v. Acer Inc.*, No. 6:24-cv-536, 538, 539. In addition, some of the patents (or related patents) were also asserted in prior litigation against ASUSTeK, Acer, Micro-Star International Co., Ltd., and Samsung. *See* No. 6:22-cv-311, 312, 313, 511, 512, 513, 639, 640, 641, and No. 6:20-cv-139.

[2] Each patent in this family are continuations of and claim priority to U.S. Patent No. 8,735,791 ("'791 Patent"), among others.

[3] The '342, '7562, and '135 Patents are continuations of and claim priority to U.S. Patent No. 9,256,007 ("'007 Patent"). The '306 Patent is a continuation-in-part of the '007 Patent. The '306 and '007 Patents both claim priority to U.S. Provisional Application No. 61/214,331. The '397 and '306 Patents both claim priority to U.S. Provisional Application No. 61/461,522, among others.

[4] Each patent in this family are continuations of and claim priority to U.S. Patent No. 10,030,846, in addition to a provisional application.

| '085 Patent Family[5] | | |
|---|---|---|
| 11,194,085 (**Exhibit 14**) | '085 Patent | –0025 Case |
| 11,402,562 (**Exhibit 15**) | '2562 Patent | –0027 Case |
| 11,550,093 (**Exhibit 16**) | '093 Patent | –0026 Case |
| 11,846,794 (**Exhibit 17**) | '794 Patent | –0025 Case |
| **RE630 Patent** | | |
| RE49,630 (**Exhibit 18**) | RE630 | –0026 Case |

---

[5] Each patent in this family are continuations of and claim priority to U.S. Patent No. 11,035,993, in addition to a provisional application.

Pursuant to the Scheduling Order (*see* –0025 Case, Dkt. 35) this Court's OGP, and the Court's Order on Claim Construction Briefing (Dkt. 36), ASUSTeK provides its Opening Claim Construction Brief for terms of the 18 patents asserted against it by SVV Technology Innovations Inc. ("SVV") ("Asserted Patents").

## I.    INTRODUCTION

The eighteen (18) patents at issue in this case each name Sergiy Vasylyev—who drafted and prosecuted the patents himself—as the sole inventor and purport to describe multiple fields of inventions. As explained below, a first group of patents ("the '197 Patent Family") only describe face-lit illumination systems (*infra* Section A through D). This is abundantly clear from the inventor's express statements in the specification and file histories of the '197 Patent Family. A second group of patents ("the '791 Patent Family") only describe light trapping/collecting systems (*infra* Sections E through K). Again, this fact flows from the inventor's statements in the specifications and file histories. The Court should hold inventor to his word as to what his inventions do, and do not, cover, which are reflected in ASUSTeK's constructions. There are additional patent families involved in this case and ASUSTeK addresses terms from those families, some of which overlap with the '197 and '791 Patent Families, in the additional sections.

As demonstrated below, ASUSTeK's constructions are supported by the specifications, file histories, common dictionary definitions (including those relied on by the inventor himself), and a technical expert. The Court should credit all this evidence and adopt ASUSTeK's constructions.

## II.    ASUSTEK'S PROPOSED CLAIM CONSTRUCTIONS[6]

### A.    The Claimed Inventions of the '197 Patent Family[7] as a Whole are Limited

---

[6] As the Court is very familiar with the legal standards for claim construction, ASUSTeK only refers to canons of claim construction relevant to its arguments in the sections below and focuses on the substantive issues unique to this case.

[7] The '197 Patent Family includes the '197 Patent and the '340 and '621 Patents, which are continuations of the '197 Patent and share a common specification. Citations will only be made to the '197 Patent.

1

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '197 Patent: All Claims<br>'340 Patent: All Claims<br>'621 Patent: All Claims | The claims read only on face-lit illumination systems, and methods of making the same, and not edge-lit illumination systems. | Not limited. |

The inventor made it abundantly clear what his invention is—"a face-lit illumination system"—and what his invention is not—"an edge-lit illumination system." The Court should construe the claims *as a whole* as limited to face-lit systems because the patentee's own words leave no other plausible reading. While the Court may be used to construing a particular claim term or phrase, where the patentee has clearly disavowed a class of technology, the Court may simply say so. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d1337, 1341 (Fed. Cir. 2001) (construing the asserted claims to "read only on catheters with coaxial lumens, and not on catheters with dual or side-by-side lumens"); *see also Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*, 752 F. App'x 1024, 1032 (Fed. Cir. 2018) (finding that claims do not require a "textual hook" for a limiting construction and that the claims at issue "exclude films produced solely by conventional top air drying methods" that were distinguished in the specification); *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (finding "district court properly construed claim 1 to be limited to "buccal and sublingual formulations" despite not including those terms); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (holding that the "specification read as a whole leads to the inescapable conclusion that the claimed invention must include play in every embodiment," despite the claim language not including "play"). And that is the case here. No member of the public reviewing these patents would believe they apply to traditional edge-lit displays, and failure to restrict these patents as a matter of law based on the clear statements of the patentee would result in denying the public of the fair notice

patents are intended to provide. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely."). The Court should adopt ASUSTeK's construction and limit the claims of the '197 Patent Family to "face-lit illumination systems" and not conventional "edge-lit illumination systems."

### 1. Relevant Legal Standards

There are three main principles for assessing whether a patentee's statements result in a disavowal from the claims as a whole. The first principle is that an inventor may disavow claim scope "by distinguishing the claimed invention over the prior art" or "repeated derogatory statements" about the subject matter disclaimed. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997; *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d1361, 1372 (Fed. Cir. 2012). For example, "an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). When a patentee distinguishes prior art in this manner, they are "indicating what a claim does not cover." *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998); *see also Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) ("An inventor may . . . disavow claim scope by distinguishing the claimed invention over the prior art.").

The second principle is that "an inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *Poly-Am.,* 839 F.3d at 1136-37. Thus, "[w]hen a patent [] describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) *see also Pacing Techs., LLC v. Garmin Int'l, Inc.*,

3

778 F.3d 1021, 1024 (Fed. Cir. 2015).

The third principle is that it appropriate to limit a claim where every embodiment and figure supports a limiting construction. In particular, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor" in which case "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*); *see also Poly-Am.,* 839 F.3d at 1136-37 (finding a disclaimer where "[e]very embodiment described in the specification" had a specific, limiting feature). This can be true "[w]here each figure in the asserted patent aligns with a particular construction … such figures offer further support for that particular [limiting] construction." *Barrday, Inc. v. Lincoln Fabrics Inc.*, No. 2022-1903, 2023 WL 7871688, at *5 (Fed. Cir. Nov. 16, 2023) (collecting cases); *Am. Piledriving Equip., Inc. v. Geoquip, Inc*., 637 F.3d 1324, 1334 (Fed. Cir. 2011) (noting that "a statement in the specification that describes the invention as a whole can support a limiting construction" and "[t]hat is especially true where, as here, other statements and illustrations in the patent are consistent with the limiting description.").

In any instance, while a disavowal must be clear, it need not be as explicit redefinition or disavowal, and "may be inferred from clear limiting descriptions of the invention in the specification or prosecution history." *See Trs. Of Columbia Univ. v. Symantec Corp*., 811 F.3d 1359, 1363 (Fed. Cir. 2016); *See also Barrday,* 2023 WL 7871688, at *5; *Aventis Pharma S.A. v. Hospira, Inc*., 675 F.3d 1324, 1330 (Fed. Cir. 2012). There is no question here that a disavowal of claim scope is present here.

### 2. The Inventor Repeatedly Described His Invention As "Face-Lit" Illumination Systems "As Opposed To Edge-Lit" Systems

Throughout the specification, the inventor consistently describes his invention as a "face-

lit illumination system," or a system for injecting light into the face of a material, rather than a conventional edge-lit system. *See* '197 Patent, 1:63-67. Indeed, the Abstract introduces the invention as a "face-lit waveguide illumination system." *See Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) ("We have frequently looked to the abstract to determine the scope of the invention...." (citations omitted)). The "Field of Invention" similarly describes the invention as "an apparatus and method of ***inputting light into a planar waveguide through its face*** <u>**as opposed to edge-lit light guide panels where light is input through one of the waveguide edges**</u>."[8] *Id.*, 1:49-53. The Background of the Invention explains that conventional light devices employ a light source coupled to a waveguide's edge and that problems arise with the conventional edge-lit system, such as the edge not being accessible or because the edge may be too small compared to the size of the light source. *Id.*, 1:63-2:20. "It is therefore an object of this invention to provide an ***improved illumination system providing an efficient light input through a face of a planar waveguide*** <u>**as opposed to light input through an edge**</u>." *Id.*, 2:21-24; *see also id.*, 8:14-23, 12:31-38. The '197 Patent is replete with such descriptions of the invention as "face-lit" and the advantages of the same compared to conventional "edge-lit" systems:

- "***It is [] an object of this invention*** to provide means for utilizing such already existing optically-transmissive structures … ***so that light can be injected into the face of the respective waveguide*** … <u>**without having to access its edges for light input**</u>. *Id.*, 8:1-8.
- "***The present invention solves a number of problems*** associated with light distribution and illumination using planar waveguides ***by providing a face-lit solution which is*** <u>**not hindered by the limitations of conventional edge-lit illumination devices requiring the access to waveguide edges**</u>[.]" *Id.*, 2:52-57.
- "Also, it is noted that ***this invention*** may be applied to a variety of panel lighting and signage applications where edge-lit LGPs have been traditionally employed. Since ***the light injection components of system 2 can be attached to either front or back surface of the LGP***, <u>**no access to the panel's edge is necessary**</u> ***which may enhance the utility of the device***, <u>**especially in the applications where the access to the edges is difficult or unwanted**</u>." *Id.*, 12:31-38.

---

[8] All emphases are added unless noted otherwise.

The inventor's criticisms and distinguishing of conventional edge-lit systems from the invented, and improved, face-lit system conveys what the inventor believes his invention covers and what it does not. *See e.g., Poly-Am.,* 839 F.3d at 1136.

The inventor further cemented the scope of his invention by repeatedly describing the "present invention" as a "face-lit illumination system." Indeed, the "Brief Summary of the Invention" states that "***the present invention is directed to face-lit planar waveguide illumination systems*** …." '197 Patent, 2:42-47; *see C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention."). Similar descriptions of "the invention" are found throughout the specification:

- "More particularly, ***this invention is directed to a system for injecting light into the face of*** a planar plate, slab or substrate of an optically transmissive material …." '197 Patent, 2:47-51; *see also* 2:29-31.
- "An advantage of ***the present system*** is to ***provide controlled light input trough a face of the planar waveguide*** …." *Id.*, 2:58-64.
- "***Light is injected into the planar waveguide*** by means of an elongated (linear) optical element ***attached to a face*** of the waveguide and ***optically coupled to said face***." *Id.*, 2:65-67.
- "FIG. 1 depicts an embodiment of a ***face-lit waveguide illumination system 2 in accordance with the invention***." *Id.*, 7:44-45.
- "While there are many uses for ***the face-lit illumination system of this invention*** …." *Id.*, 7:51-56.
- "Framed window panes … may be particularly suitable for ***face-lit waveguide illumination systems disclosed in this invention***." *Id.*, 12:12-14.

The inventor's characterization of his "invention" as a "face-lit" system no less than 7 times results in a disavowal of conventional edge-lit systems. Where, as here, the specification "describes the present invention as having [a] feature," that representation may disavow contrary embodiments. *See Poly-America*, 839 F.3d at 1136; *see also Regents of Univ. of Minnesota*, 717 F.3d at 936; *Techtronic Indus.*, 944 F.3d at 907.

6

If that were not enough, the inventor's characterization of the scope of his invention continues through the description of every single figure. The description of Figures 1-14, 16 and 17 each relate to the "***face-lit waveguide illumination system***." '197 Patent, 5:1-64, 6:1-9. Figure 15 describes a "linear optical element 50" for use with the "face-lit waveguide illumination system" of Figure 12. *Id*., 5:51-55, 5:65-67, 28:27-28. The specification concludes by stating that "[t]he structure and operating principles of the ***above described embodiments of face-lit illumination systems*** …" can be used with various objects that can act as a waveguide. *Id*., 30:23-28. The inventor's repeated and consistent characterization, in the specification and figures, of his invention being directed to a face-lit system aligns with a limiting construction. *See Barrday,* 2023 WL 7871688, at *5; *Poly-Am.,* 839 F.3d at1136-37.

"The public is entitled to take the patentee at his word and the word was that the invention is" a "face-lit illumination system." *Honeywell Int'l, Inc. v. ITT Indus., Inc*., 452 F.3d 1312, 1318 (Fed. Cir. 2006). Because the inventor made the scope of his invention abundantly clear to the public, the Court should limit the claims to "read only on face-lit illumination systems, and methods of making the same, and not edge-lit illumination systems."[9]

**B. "randomized"[10] / "randomized positions within the two-dimensional pattern" / "randomized two-dimensional pattern" / "the two-dimensional pattern is random or quasi-random"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '135 Patent: 2<br>'342 Patent: 1<br>'085 Patent: 2, 26<br>'2562 Patent: 4 | Indefinite. | "randomized": placed in positions that do not follow a simple, repeating pattern. It does not require a complete lack of predictability;<br><br>[no construction required if "randomized" is construed] |

---

[9] If the Court adopts ASUSTeK's proposed construction, the Court does not need to address the "light coupling area" term.
[10] Only proposed by SVV.

|  |  | "randomized positions": "positions that do not follow a regular or periodic geometric spacing pattern" or "positions that are not fixed in a uniform or regularly repeating arrangement" or "not having a regular, ordered, or periodic pattern, but does not have to be completely random or unpredictable"; |
|  |  | [no construction required if "randomized" is construed] "randomized two-dimensional pattern": "two-dimensional arrangement of elements that is not fixed in a uniform or regularly repeating order" |
|  |  | "quasi-random": A non-repeating arrangement that approximates randomness. |

The parties agree that the concept of "random," as used in the claims, requires Court input and both parties identified definitions from the same dictionary in support of their positions. The identified terms can be split into two groups that, when viewed in the context of the surrounding claim language and ordinary meaning of the same, demonstrate that the claims are indefinite.

The <u>first group</u> of claims recite "light extracting surface relief features" ('135 Patent, Claim 2) or "light deflecting elements" ('342 Patent, Claim 1). Independent Claim 1 of the '135 Patent recites that the "light extracting surface relief features" are "formed … according to a two-dimensional pattern" and, in Claim 2, requires that the surface relief features "have **randomized positions within the two-dimensional pattern**." Claim 1 of the '342 Patent similarly requires that the light deflecting features are "distributed … **according to a randomized two-dimensional pattern**."

The <u>second group</u> of claims recites a "patterned light extraction area" and "light extraction microstructures" that are "distributed over the **patterned** light extraction area **according to a two-**

**dimensional pattern**." '085 Patent, Claims 1, 19; '342 Patent, Claim 1. The dependent claims[11] then require that "the two-dimensional pattern is random or quasi-random."

It should be obvious that something formed in a "two-dimensional pattern" cannot also be "random" or "randomized." This is plainly seen from the dictionary definitions identified by the parties. SVV's identified extrinsic evidence defines "randomize" as "to select, assign, or arrange in a **random** way." Ex. 19 (Merriam-Webster Dictionary definition). The same dictionary reveals the commonly understood definition of "random" as "**lacking a** definite plan, purpose, or **pattern.**" Ex. 20 (Merriam-Webster Dictionary definition); *see also* Ex. 21 (dictionary.com definition of "random" is "proceeding, **made**, or occurring **without definite** aim, reason, or **pattern**"). This is further evident from SVV's proposed constructions of the "random" terms which all preclude the existence of a "pattern." The concept of a "two-dimensional pattern" of structures and those structures also being randomized are clearly inconsistent and render the claims indefinite.

This is clearly seen, by way of example, from the Claim 1 of the '135 Patent, which requires that the surface relief features are "formed … according to a two-dimensional pattern." Claim 2 then requires that these same surface relief features have "randomized positions within the two-dimensional pattern." By definition, surface relief features "formed … according to a two-dimensional pattern" cannot also be positioned randomly (i.e., lacking a pattern). The features are either in a pattern or random, but they cannot be both. This internal inconsistency in the claim language renders the claims indefinite. *Competitive Technologies, Inc. v. Fujitsu Ltd.*, 185 F. App'x 958, 965-66 (Fed. Cir. 2006) (holding the claim internally inconsistent and thus, indefinite because the "address means" limitation of claim 5 requires ISA structures, and the "sustain means"

---

[11] Claim 2 of the '085 Patent depends from Claim 1; Claim 26 of the '085 Patent depends from Claim 19; Claim 4 of the '2562 Patent depends from Claim 1.

limitation of the same claim excludes ISA structures); *see also Driessen v. Sony Music Ent.*, 640 F. Apex 892, 895 (Fed. Cir. 2016) ("Claim terms must be construed in light of the context in which they appear.").

Finally, SVV's proposed construction of "randomized" is not even supported by its dictionary definition, which requires a "random" (i.e., lacking a pattern) arrangement. In addition, SVV injects the ambiguous concepts of a "simple" pattern that "does not require a complete lack of predictability." SVV's constructions are not supported by the intrinsic or extrinsic evidence and only highlights the inconsistency of the claim language.

Accordingly, the Court should find these claims indefinite.

### C.    "light coupling element"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '197 Patent: 1<br>'340 Patent: 2, 3<br>'621 Patent: 3, 4 | "an optical structure, distinct from the side-emitting LED packages and the optically transmissive material/sheet, designed to facilitate transfer of light between those two components" | Plain and ordinary meaning. Alternatively, "an optical structure designed to facilitate transfer of light between distinct optical components (e.g., from a light source such as LED to a waveguide)". |

The primary dispute between the parties is whether a "light coupling element" is "distinct from the side-emitting LED packages and the optically transmissive material/sheet." SVV's proposed construction appears to recognize as much by stating that the light coupling element transfers light from a light source to a waveguide (i.e., optically transmissive sheet). However, SVV's inclusion of "designed to facilitate" creates room for ambiguity as to whether the light coupling element can be part of the light source or the optically transmissive sheet.

The answer to the parties' dispute lies in the claim language, which clearly recites "light coupling elements" as a distinct component from the LEDs and the transmissive material/sheet.

Specifically, the claims recite the following as distinct components of a "light guide illumination system: "a planar sheet of an optically transmissive material," "a plurality of electrically interconnected side-emitting LED packages," and "a plurality of light coupling elements formed from an optically transmissive dielectric material and **configured for coupling light from the side-emitting LED packages to the planar sheet of the optically transmissive material**." *See, e.g.,* '197 Patent Claim 1. For the "light coupling elements" to couple light from LED packages to the optically transmissive sheet, they must be separate from the LED packages and optically transmissive sheet. Where, as here, a claim recites elements separately, this "implies that the '[elements]' are a structurally distinct component," especially where "[t]here is nothing in the asserted claims to suggest that the [separately claimed elements] can be the same structure." *SandBox Logistics v. Proppant Express Invs*., 813 F. App'x 548, 555-56 (Fed. Cir. 2020) (quoting *Becton, Dickinson & Co. v. Tyco Healthcare Gr*p., 616 F.3d 1249, 1254 (Fed. Cir. 2010).

Further, the specification repeatedly describes that light coupling elements are separate from, but attached to, the face of the optically transmissive sheet. Specifically, the light coupling elements are "attached to," "glued to," or "coupled to" the waveguide. '197 Patent, 8:23-26. Indeed, it is "important that the optical element 6 is ***attached to the face*** … externally, that is ***without surface penetration***." *Id*., 8:23-29, 12:33-38, 12:46-48, 13:18-20, 14:35-37, 19:5-8, 24:19-22, 28:16-17, 29:30-32; *see also id*., 2:24-28, 3:1-4. The figures confirm that a light coupling element is attached to, but separate from, the waveguide. *Id*., Figs. 1-14, 16-17. But the '197 Patent never describes a light coupling element as being a part of the optically transmissive sheet. The inventor clearly knew how to claim components separately and as part of a particular element (e.g., "light extraction features" are "formed in at least one of the first and second broad-area surfaces" of the optically transmissive material/sheet). He chose not to do the latter with respect to the "light

coupling elements."

Given the '197 patent's clear and only description that "light coupling elements" are attached to and separate from the optically transmissive material/sheet, and not a feature of the material/sheet itself, the Court should adopt ASUSTeK's construction.

**D.    "light coupling area"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '197 Patent: 3, 4<br>'340 Patent: 1, 2, 11, 14<br>'621 Patent: 1, 2, 3, 17, 19, 26<br>'794 Patent: 17 | "an area of the optically transmissive sheet that receives and conditions external light first received through the first or second broad area surface" | "an area of the optically transmissive sheet that receives and conditions external light" |

The parties dispute is whether "light coupling area" receives and conditions external light from a particular location of the optically transmissive sheet. As with the discussion in Section A, the patentee clearly limited the invention to "face-lit illumination systems" such that the only area in which light is coupled is through a face of the waveguide. *See, e.g.,* '197 Patent, 6:58-62 ("***The present invention*** seeks to provide illumination systems capable of *coupling light* into a planar waveguide ***through its broad-area front or back surface*** in one location …."), 8:1-8. Thus, ASUSTeK's proposed construction is warranted.

The specification confirms ASUSTeK's construction. A "light coupling area" or a "coupling area" for light is mentioned in only three places. The first instance describes the potential for light leakage from the "light coupling area," which is prevented by placing a "light masking element 142" on the "opposing face" of the optically transmissive sheet from where light is input. *Id*., 23:36-40, Fig. 9. The next mention of a "light coupling area" refers to fibers that input light to the face of a broad-area surface through a light transmitting film. *Id*., 29:43-47, Fig. 17. Finally,

the specification describes light rays entering the optically transmissive sheet through a "coupling area" formed by the optical contact of face of a light coupling element 16 and face 100 of the optically transmissive sheet (or waveguide). *Id*., 25:5-12, 24:14-15 ("In the illustrated case, face 100 is chosen for light input."), Fig. 10. In each of these instances, the specification is referring to a coupling area produced by light input to the face (or broad-area surface) of the optically transmissive sheet, as shown in the annotated figures below.



Additionally, the specification consistently describes, in the specification and the figures, the "light coupling optical element 6" being attached to, and injecting light into, a broad area surface or face of the optically transmissive sheet. *See id.*, 8:19-23, 13:12-20, 15:13-34, 16:6-17, 17:27-44, 18:60-19:1, 21:26-32, 21:47-51, 22:38-46, 23:5-8, 24:5-15, 25:43-46, 27:6-21, 28:10-13, 28:58-64, 29:6-8, Figs. 1-14, 16-17. Because there are no embodiments or descriptions of light being coupled through an edge (because edge-lit systems were disavowed), the light coupling area is defined by light coupled through the face.

Accordingly, the Court should construe "light coupling area" as "an area of the optically transmissive sheet that receives and conditions external light first received through the first or second broad area surface.

E.    **The Claimed Inventions of the '791 Patent Family[12] As A Whole Are Limited**

---

[12] The '088, '089,'157, '475, and '951 Patents share a common specification as continuations of U.S. Patent No. 8,735,791 ("'791 Patent). Thus, citations to the '088 Patent will only be made in this discussion. For

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '089 Patent: All Claims<br>'157 Patent: All Claims<br>'475 Patent: All Claims<br>'088 Patent: All Claims<br>'951 Patent: All Claims<br>'306 Patent: All Claims | The claims only read on light trapping/collecting systems and not illumination systems. | Not limited. |

Similar to the '197 Patent Family, the inventor clearly cabined the scope of the invention of the '791 Patent Family to "light trapping/collecting systems," and not systems that lose or emit light (i.e., illumination systems). Throughout the specification, the invention is described as a system that collects and traps light for absorption, and never once describes its invention as a system that emits light. No member of the public reading these patents would believe they apply to "illumination systems." Accordingly, the Court should limit the claims of the '088 Patent Family to "light trapping/collecting systems" and not include "illumination systems."

### 1. The Inventor Repeatedly Described His Invention As A Light Trapping/Collecting System, Not An Illumination System

The specification repeatedly and consistently describes the "invention" as a system that collects or traps light. For example, the Field of the Invention states the "*[t]he present invention*" is a "device and method for *harvesting radiant energy* emanated by a distant radiant energy source, particularly, to *collecting the sunlight and absorbing it* by a light sensitive material, medium or device." '088 Patent, 1:47-50; '306 Patent, 1:52-53 ("*The present invention* relates to a device and method for *enhancing the light trapping* in light harvesting devices."). It continues, "*the present invention relates to … devices … having light trapping microstructures or layers to improve absorption of light within the light sensitive layer*[.]" '088 Patent, 1:51-55; '306 Patent,

---

purposes of this construction, the '306 Patent is included and citations to the '306 Patent will be separately identified as it has a specification that is different in certain respects from the other patents.

1:54-62. Indeed, the invention is introduced in the abstract as a "light converting optical system" using a "***light trapping*** optical structure." '088 Patent, Abstract; *see Hill-Rom*, 209 F.3d at 1341 n.*. These repeated statements regarding "the present invention" limit the claim scope of the invention to light trapping systems. *See Techtronic Indus.*, 944 F.3d at 907; *Regents of Univ. of*, 717 F.3d at 936; *Pacing Techs.,* 778 F.3d at 1024.

The '088 Patent describes the problem with conventional devices as including thick layers to "absorb most of the light." '088 Patent, 1:59-67; '306 Patent, 1:66-2:6. While conventional devices also include thinner layers, they require some form of "light trapping" that "result in better absorption," but even those devices "cannot prevent [] a substantial portion of incident light to escape from the device without being absorbed." '088 Patent, 2:10-36; '306 Patent, 2:6-13. "It is therefore an ***object of this invention to provide an improved light harvesting system*** employing a novel photovoltaic structure ***with efficient light coupling and trapping*** thus ***minimizing energy loss***." '088 Patent, 3:4-7; '306 Patent, 2:13-17. To solve the problems with conventional devices, "the present invention" provides "a layered structure … that allow[s] for enhancing the light coupling efficiency, increasing the light path through the photosensitive material and for ***trapping the incident light within the device*** by means of at least TIR." '088 Patent, 3:8-13; *see also id.*, 3:13-16 ("The ***light trapping*** causes multiple passage of the trapped light through the photoresponsive (active) layer thus improving the light absorption and energy conversion efficiency."); '306 Patent, 2:18-27.

Accordingly, "***[t]he present invention*** solves a number of light harvesting problems within a compact system ***utilizing efficient light coupling and trapping mechanisms***. Light is injected into a photoresponsive layer … and ***trapped within the layer*** so that the useful light absorption is substantially enhanced." '088 Patent, 3:22-27; '306 Patent, 2:31-33 ("***The present invention***

15

solves a number of light harvesting problems within a compact system *utilizing efficient light deflection and trapping mechanisms*.”). The systems employ microstructures “for efficient light trapping.” ’088 Patent, 3:28-30. The ’088 Patent’s characterization of the problem to be solved as preventing light loss from a system through light trapping is relevant to claim construction. *See Sequoia Tech., LLC v. Dell, Inc*., 66 F.4th 1317, 1326 (Fed. Cir. 2023) (“We have explained that a patent’s express purpose of the invention ‘informs the proper construction of claim terms.’”); *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020) (“A patent's statement of the described invention's purpose informs the proper construction of claim terms[.]”).

The specification further describes the invention with reference to its figures “to compare and contrast” the present invention with typical photovoltaic structures (depicted in Figures 1-2). ’088 Patent, 3:65-67. Specifically, the light harvesting system uses a photovoltaic layer “for trapping the light.” *Id*., 14:9-15; *see also id*., 15:1-6, 16:16-20, 17:22-26, 17:43-46, 17:47-51, 18:6-7, 18:26-31, 18:56-19:9, 19:47-54, 21:28-35, 21:42-46; ’306 Patent, 12:20-23, 13:9-14, 13:45-46, 13:66-14:4, 14:28-31, 15:16-20, 15:33-37, 15:66-16:3, 16:4-9, 16:34-36, 17:35-42, 19:42-46, 20:14-20. The light rays can propagate through the layer until the light is absorbed with photocurrent generation. ’088 Patent, 15:1-6, 15:29-38, 16:16-20, 17:22-26, 17:43-46, 17:47-51, 18:6-7, 18:26-31, 18:56-19:9, 19:47-54, 21:22-35, 21:42-46. The accompanying figures similarly depict a system in which light is trapped in layer 4. *See* ’088 Patent, Figs. 11-18; ’306 Patent, Figs. 16-22; *Barrday,* 2023 WL 7871688, at *5. The consistent description of the invention as a system for collecting and trapping light should be accounted for in the construction. *Barrday,* 2023 WL 7871688, at *5; *Poly-Am.,* 839 F.3d at 1136-37; *Am. Piledriving Equip.,* 637 F.3d at 1334.[13]

Finally, the title of each patent in the ’791 Patent Family includes a “light converting

---

[13] Certain claims of the ’791 Patent Family also describe the arrangement of various layers in the claim as a “light trapping [optical] structure.” *See* Section H.

system" using "light trapping and light absorbing structures" and methods of making the same. *See Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1003 n.2 (Fed. Cir. 2016) ("We have used the title of a patent to aid in claim construction."); *see also, e.g., Forest Labs*., *LLC v. Sigmapharm Labs*., LLC, 918 F.3d 928, 933 (Fed. Cir. 2019) (partly relying on the patent's title when limiting claim's scope). While the title alone is not dispositive, when combined with the Field of the Invention, the problem purportedly solved, and the specification's description of every embodiment of the invention, it is abundantly clear that the invention is limited to light trapping/collecting systems. *See Ruckus Wireless,* 824 F.3d at 1003-04.

In contrast, the specification does not ever describe purposefully emitting light from a system, as would occur in an illumination system.[14] Indeed, the word "illuminate," or any variation or corollary concept, is never mentioned. Nor do any of the figures ever depict a light ray leaving the system. In fact, the specification describes that the "loss of useful light … hamper[s] the utility" of such devices. '088 Patent, 2:63-65; '306 Patent, 2:12-16. The inventor could not have been clearer that his system was directed to a light trapping/collecting system designed to retain light in the system for absorption and not a system that loses or emits light (i.e., an illumination system). *See Kinik Co. v. Int'l Trade Comm'n*., 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The inventor's discussion of the disadvantages of the low binder prior art sheds light on the scope of the invention."); *see also Uniloc 2017 LLC v. Verizon Commc'ns, Inc*., 846 F. App'x 914, 916–17 (Fed. Cir. 2021) (affirming district court construction where plaintiff's construction "would both embrace the disparaged disadvantage of the prior art and spurn the touted capability of the invention"); *SciMed*, 242 F.3d at 1342-43 (noting that where specification discusses

---

[14] The '791 Patent Family claims priority to a provisional application filed in July 2010. The '342 Patent— which describes and claims to "illumination systems" claims priority to a provisional application filed in March 2010. Thus, in a similar timeframe, the inventor evidenced an ability to expressly describe illumination systems when he intended to do so. He failed to do so in the '791 Patent Family.

"disadvantages of certain prior art structures," the "claim should not be read so broadly as to encompass the prior art").

The distinction between a waveguide that collects, traps, and absorbs light compared to one emits light was made clear during prosecution of the '791 Patent. There, the inventor contrasted the prior art with the "present invention" because the former taught an "optical waveguide" "formed by an optically transmissive body suitable for the purpose of conducting electromagnetic radiation [i.e., light] toward … a pre-determined portion of the waveguide" where "the light can be ultimately absorbed by another element" (i.e., the light leaves the system), while "the photoresponsive layer of the present invention is by itself configured to absorb light internally." Ex. 21, ('791 Patent File History), 11/4/2013 Response to Office Action, pp. 7-9. In other words, "[the prior art] teaches away from the operation recited in ***the present invention*** where light is injected into a photoresponsive layer to ***increase light trapping and improve light absorption***" and the prior art "***do[es] not provide the benefit of absorption-enhancing light trapping*** light in a photoresponsive layer of the present invention." *Id*. Thus, the inventor clearly distinguished between systems that trap light for absorption from those that emit light.

The inventor made this distinction clear during prosecution of other patents. In the inventor's own words,[15] an "illumination apparatus and [] solar energy collector are [] ***clearly from different fields of endeavor*** **(illumination systems** **and solar energy collectors,** *respectively*)[,]" because an illumination apparatus "employs a light source and other optical elements to emit light" and "a solar energy collector … is directed to solving a completely different problem: collecting the solar energy." Ex. 23 ('342 Patent File History), 12/28/2016 Response to Office Action, pp. 3-

---

[15] The sole inventor prosecuted and personally signed the office action responses for the patents at issue in this case.

4; *see also* Ex. 24 ('342 Patent File History), 10/15/2017 Response to Office Action, p. 18 ("Claim 1 is directed to an **illumination apparatus** that employs **a light source** and other optical elements **to emit light**. In contrast, Ghosh's device is a **solar energy concentrator** that is directed to solving a completely different problem: **collecting the solar energy**."; Ex. 25 ('007 Patent File History), 8/8/2015 Response to Office Action, p. 18 ("[T]hose skilled in the art will appreciate that … a collector system does not become a collimation system by merely reversing the light path of individual rays and the conversion of a light collecting optical system to a light collimating system may not be … at all possible[.]"); Ex. 26, ('007 Patent File History), 3/10/2015 Response to Office Action, p. 21 (contrasting prior art light trapping/collecting system and illumination system (referred to as concentrators and collimators, respectively) and emphasizing "[i]t will be appreciated by those skilled in the art that, even though concentrators and collimators may occasionally employ similar optical elements, the purpose, structure and operation of concentrators and collimators are different.").

In view of the foregoing, the specification, figures, prosecution history and extrinsic evidence reflect that the inventions of the '791 Patent Family are limited to light trapping/collecting systems that ultimately absorb light, and not illumination systems designed to emit light. Therefore, ASUSTeK's construction should be adopted.[16]

### F.    "quantum dots"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '088 Patent: 26<br>'089 Patent: 14, 20<br>'157 Patent: 1, 2, 14, 15<br>'475 Patent: 2, 7, 8, 15, 21- 26<br>'951 Patent: 2, 8, 9, 15, 16 | "a semiconductor nanoparticle confined in all three spatial dimensions that absorbs light for conversion into electricity" | "a very small particle of semiconductor material whose size determines the color of light it absorbs or emits" |

---

[16] If the Court adopts ASUSTeK's proposed construction, the Court does not need to address any of the terms in Sections F through K.

The parties agree that the Court should construe "quantum dots." The primary dispute between the parties is whether the construction should include "conversion into electricity" or "color." Again, the specification is dispositive of the dispute. The sole mention of "quantum dots" in the specification states the "photovoltaic layer" can incorporate "semiconductor photovoltaic materials," such as "quantum dots" which "**allow for efficient conversion of light into electricity**." '089 Patent, 11:31-42. In contrast, the specification makes no mention of color. Accordingly, ASUSTeK's proposed construction should be adopted.

As discussed above in Section E, the '088 Patent is singularly focused on the collecting, trapping, and absorbing light without emitting light. The specification repeatedly describes that the photovoltaic layer, in which quantum dots are embedded, generates electricity through absorption of light in the photovoltaic layer. '088 Patent, 16:46-51 ("Segment 156 or ray 126 can undergo multiple reflections from surfaces 34 and 32 passing photovoltaic layer 4 multiple times till it is absorbed or, when the bend angle is large enough, ray segment 156 may even never reach either surface 32 or 34 before being essentially ***absorbed and converted to electricity***."). Specifically, light is absorbed in the photovoltaic layer with "photocurrent[17] generation" (or conversion to electric current). *Id*., 15:29-33 (describing light rays passing through photovoltaic layer "to increase[] the chance ***of absorption with photocurrent generation***."), 16:16-20 ("The ray will thereby become trapped and its propagation in photovoltaic layer 4 can continue, which may include additional bounces from surfaces 32 and 34 until the ray energy is ***absorbed and converted to electric current***."), 21:28-35 ("It will be appreciated by those skilled in the art that system 2 can

---

[17] "Photocurrent" is "an electric current produced by a photoelectric effect." *See* Ex. 27 (https://www.dictionary.com/browse/photocurrent); *see also* Ex. 28 (https://www.rp-photonics.com/photocurrent.html) (defining "photocurrent" as "an electric current which is induced by incident light in a photodetector"); Ex. 29 (https://www.sciencedirect.com/topics/engineering/photocurrent) ("Photocurrent (I ph) is defined as the electrical current generated in a photodetector in response to incident radiant power ….").

be used to effectively capture [light], trap and guide it through its photovoltaic element or layer so that ***substantially all of the beam can be absorbed and converted into the electric current*** using a much thinner layer of photoabsorptive material than in conventional devices."); *see also id.*, 8:12-18, 10:48-52, 10:58-62. That the photovoltaic layer generates electricity is consistent with the common understanding of the term "photovoltaic," which is the generation of electricity from light using a semiconductor (e.g., quantum dot). Ex. 30 (https://seia.org/photovoltaics/) ("Photovoltaic (PV) devices generate electricity directly from sunlight via an electronic process that occurs naturally in certain types of material, called semiconductors."). Thus, given the '088 Patent's singular mention of a quantum dot, and consistent description of generating electricity from absorbed light, the Court should adopt ASUSTeK's construction, which incorporates the common understanding of a quantum dot as "a semiconductor nanoparticle that confines the motion of electrons and holes in three spatial directions." Ex. 31 (https://link.springer.com/rwe/10.1007/978-0-387-48998-8_1325).

SVV's attempt to inject the irrelevant concept of "color" into these patents should be rejected. The specification and claims do not once mention the word "color." Nor does it mention or describe the concept of absorbing light of one wavelength and converting and emitting it to a different wavelength using a quantum dot, or other semiconductor material, as SVV proposes. In short, there is absolutely no support in the intrinsic record to support SVV's construction.

In view of the foregoing, the Court should construe "quantum dots" as "a semiconductor nanoparticle confined in all three spatial dimensions that absorbs light for conversion into electricity."

G.    "band gap" / "bandgap"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|

| | | |
|---|---|---|
| '088 Patent: 26<br>'089 Patent: 20<br>'157 Patent: 1<br>'475 Patent: 1, 14<br>'951 Patent: 1, 17, 18 | "the energy difference between the valence band and the conduction band of a semiconductor, representing the minimum energy required to excite an electron to conduct electricity" | "the energy threshold of a semiconductor material that determines the color (wavelength) of light it absorbs and/or emits" |

The parties agree that the Court should construe "band gap" / "bandgap." Again, ASUSTeK proposes a construction consistent with the specification and dictionary definition, while SVV again attempts to inject the concept of "color"—foreign to the patents—into the construction. The Court should adopt ASUSTeK's construction.

As discussed in the preceding section, quantum dots are the material through which the system of the '088 Patent converts light to electricity. The "bandgap" of a particular quantum dot is the mechanism through which the quantum dots achieve this conversion of light to electricity.

The common meaning of "bandgap" is "the energy difference between the valence band the conduction band" of a material. Ex. 32 (https://www.merriam-webster.com/dictionary/bandgap); *see also* Ex. 33 (https://energyeducation.ca/encyclopedia/Band_gap); Ex. 34 (https://www.dictionary.com/browse/bandgap).[18] In other words, "the band gap represents the minimum energy that is required to excite an electron up to a state in the conduction band ***where it can participate in conduction***." Ex. 33 (https://energyeducation.ca/encyclopedia/Band_gap).

The '088 Patent only uses the word "bandgap" twice and in both instances does so to describe the conversion of light to electric current. '088 Patent, 11:13-30. There, it describes a photovoltaic layer incorporating a "multi-junction PV structure" of individuals cells with

---

[18] In a prior case, SVV relied on a dictionary that included this same definition. *See* Ex. 35 (SVV Opening CC Brief in *SVVTI v. Samsung*, No. 6:20-cv-139-ADA, Dkt. 45) at ECF p. 35 (citing to Modern Dictionary of Electronics, attached to this motion as Ex. 36 (defining "bandgap" as "the energy difference between the conduction band and valence band in a material")).

"different bandgaps" that selectively absorb solar energy at different spectral bands (i.e., wavelengths). *Id*. A "junction" in the context of the invention is where free electrons and holes diffuse, before "separat[ing] ***to produce an electric current***." *Id*., 10:58-62.

The '088 Patent similarly describes this absorption of light and conversion to electric current. Specifically, the photovoltaic layer absorbs entering light and "generates free electrons and holes." '088 Patent, 11:3-7 ("In this case, light entering photovoltaic layer 4 is at least partially absorbed and generates free electrons and holes in the intrinsic region, which are then separated by the electric field."). These electrons and holes "then separate to produce an electric current" or "photocurrent generation." *Id*., 8:12-18); *see also* 8:49-54 ("It will be appreciated by those skilled in the art … if the effective light path in layer 4 is further extended, the useful light absorption will increase thus resulting in the enhanced photocurrent generation."), 15:16-18 ("Ray 120 propagates in photovoltaic layer until it is absorbed and converted into electron-hole pair 50 due to the photo effect."), 15:29-33, 20:8-14 ("[A] substantial portion of the incident light can still be trapped in a manner described above thus resulting in a generally longer optical path of the rays within the photoresponsive layer and improved photocurrent generation."). The '088 Patent's description of "bandgap" is consistent with ASUSTeK's construction.

In contrast, SVV's again attempts to inject the concept of "color" into the construction. It should be rejected for the same reasons described in the preceding section, namely it is divorced from the intrinsic and extrinsic evidence.

Accordingly, the court should construe "bandgap"/"band gap" as "the energy difference between the valence band and the conduction band of a semiconductor, representing the minimum energy required to excite an electron to conduct electricity."

### H. "light trapping [optical] structure"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '089 Patent: 20<br>'157 Patent: 9<br>'475 Patent: 9, 22, 25<br>'951 Patent: 1, 3, 17, 18 | "a structure that captures received light" | Plain and ordinary meaning. |

These claims recite a "light trapping [optical] structure" formed by a photoresponsive/photoabsorptive/active layer and one or more additional layers or surfaces (e.g., reflective layer/surface, opaque layer, optical layer(s)). As discussed in Section E, the inventions are directed to systems for collecting and trapping light.

The '088 Patent's system uses a "light trapping optical structure" for "*confin[ing]* and redistributing light *within* the structure." '088 Patent, Abstract. Throughout the specification, the invention is described as capturing and trapping received light in a photoresponsive (active) layer for absorption. *Id.,* 15:1-6, 16:16-20, 17:22-26, 17:43-46, 17:47-51, 18:6-7, 18:26-31, 18:56-19:9, 19:47-54, 21:28-35, 21:42-46. The figures also exclusively depict embodiments for capturing received light, but not emitting light. *Id.*, Figs. 3, 11-18. After describing its invention through reference to the figures, the '088 Patent states: "It will be appreciated by those skilled in the art that system 2 can be used to effectively *capture* [light], *trap and guide it through its photovoltaic element or layer so that substantially all of the beam can be absorbed*[.]" *Id.*, 21:28-35; *see also id.*, 21:36-40 ("Furthermore, it should be understood that, as illustrated by foregoing embodiments, *the surfaces confining the captured light* within photovoltaic layer 4[.]").

Accordingly, the Court should construe "light trapping [optical] structure" as "a structure that captures received light."

I.  **"wherein [the]/[a] thickness of the [photoresponsive]/[active] layer is less than a minimum thickness sufficient for absorbing substantially all [received light in a single pass at normal incidence]/[light in a visible spectrum traversing through the active layer in a single pass]"**
    **"absorb . . . light" / "absorbing . . . light"**

**"light absorbing layer"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '089 Patent: 14, 20<br>'157 Patent: 1, 14<br>'475 Patent: 1, 14<br>'088 Patent: 26<br>'951 Patent: 1, 17, 18 | "absorbing" means "to take in light energy and produce electrical energy (e.g., charge carriers and/or electrical current) from it." | Plain and ordinary meaning. |

The specification clearly describes "absorbing," in the context of its invention, as taking light energy in to produce electrical energy. The Court's construction should reflect the true nature of the invention as repeatedly expressed in the specification.

### 1. The '791 Patent Family Only Describes "Absorbing" Light To Produce Electrical Energy

The '088 Patent states "the present invention relates to … ***improv[ing] absorption of light*** … and to a method for ***generating electricity***[.]" '088 Patent, 1:51-55; *see also* Sections E-G. Consistent with this description, the discussion of Background Art describes that conventional solar cells or light detectors include a photoresponsive (active) layer that absorbs light and "generates charge carriers due to the photovoltaic effect." '088 Patent, 1:59-62, 8:12-15. However, the photoresponsive (active) layer must have a minimum thickness to absorb most of the light, which increases the cost of manufacture when using silicon, for example. *Id*., 1:63-2:9, 8:58-61. Other materials can be made thinner, but require light trapping using textured surfaces that causes light to pass through the active layer multiple times to improve absorption. *Id*., 2:10-33. Even using existing light trapping techniques, some of the light escapes "without being absorbed and thus without producing the photocurrent." *Id*., 2:33-44, 8:33-49. These issues hamper the utility of photovoltatic devices as they do not allow essentially all of the light to pass through the active layer "as many times as necessary to cause efficient light absorption." *Id*., 2:63-3:3.

Thus, the inventor sought to address these problems by providing a structure that increases

passage of light through a photosensitive material to "improve absorption and energy conversion efficiency." *Id*., 3:8-16, 8:49-54 ("It will be appreciated by those skilled in the art, that if the chance of light reflection from the front surface of layer 4 is further reduced and if the effective light path in layer 4 is further extended, the useful light absorption will increase thus resulting in the enhanced photocurrent generation."). This is accomplished through a photovoltaic layer "that absorbs light and converts it into charge carriers and/or electric current." *Id*., 10:48-52, 11:3-7, 11:17-26.  Light absorption and conversion into electricity is further increased through embedding materials in the photovoltaic layer. *Id*., 11:31-42. The photoabsorptive layer can be made so thin it only absorbs a small portion of light in a single pass, but the rest of the light can be absorbed, and converted in an electron-hole pair due to the photo effect, through multiple passages of light through the photovoltaic layer. *Id*., 12:8-17; *see also*, 15:16-18, 15:29-38, 16:17-21, 16:46-51, 16:62-17:3, 21:28-35.

Based on this description, a POSITA would understand that the invention is directed to absorbing light and producing electrical energy from the light. Declaration of Dr. Michael Lebby ("*Lebby Decl.*"), ¶¶36-43. Accordingly, the Court should construe "absorbing" as "to take in light energy and produce electrical energy (e.g., charge carriers and/or electrical current) from it."

**J.     "wherein [the]/[a] thickness of the [photoresponsive]/[active] layer is less than a minimum thickness sufficient for absorbing substantially all [received light in a single pass at normal incidence]/[light in a visible spectrum traversing through the active layer in a single pass]"**

As noted in the preceding section, "absorbing" means "to take in light energy and produce electrical energy (e.g., charge carriers and/or electrical current) from it." Even with that construction, this claim limitation is indefinite.

### *1.   Relevant Legal Standards*

Patent claims must particularly point out and distinctly claim the subject matter regarded

as the invention. 35 U.S.C. § 112. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112 and is invalid as indefinite. *Id*. at 901. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc*., 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc*., 783 F.3d 1374, 1378 (Fed. Cir. 2015). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013). The standard "must provide objective boundaries for those skilled in the art." *Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### 2. The Specification Provides No Objective Boundary From Which A POSITA Could Determine The Scope With Reasonable Certainty

The specification only generally describes the thickness of the photoresponsive/active layer in the context of absorbing light to produce electrical energy. *See* '088 Patent, 2:1-13; *see also Lebby Decl.*, ¶¶36-43. Under any other meaning of "absorbing," this limitation does not make sense. *Id*., ¶45. This limitation requires the ability to determine the amount of light reaching the other side of the system in single pass, but if the light is simply changed in color and re-emitted, this limitation is meaningless to a POSITA. *Id*. Moreover, under any definition, there is no guidance whatsoever as to what thickness would be "sufficient for absorbing ***substantially all*** light" "in a single pass." *Id*., ¶¶46-50. A POSITA, therefore, would not how much light would need to be absorbed in a single pass to constitute "substantially all light." *Id*. Thus, absent some boundary for what it means to absorb "substantially all" light, a POSITA would not have any way

to determine a "minimum thickness sufficient for absorbing substantially all" light received in a single pass with reasonable certainty. *Id.*

Accordingly, absent a construction of "absorbing" as "to take in light energy and produce electrical energy (e.g., charge carriers and/or electrical current) from it," this claim limitation is indefinite. *Id.*, ¶51.

**K.    "linear grooves"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '157 Patent: 1, 14<br>'475 Patent: 1, 14<br>'088 Patent: 26<br>'951 Patent: 1, 17, 18 | "long, narrow cuts, channels or depressions in an otherwise smooth surface, as opposed to a corrugated surface" | Plain and ordinary meaning. |

ASUSTeK's proposed construction is borne from the specification and inventor's express statements regarding the plain meaning of "grooves," which is consistent with the common understanding, and contrasting the same with a "corrugated surface."

ASUSTeK's proposed construction is fully consistent with the specification, which describes that light input ports may be "V-shaped grooves," which are depicted as depressions in a surface. '088 Patent, 6:61-63, 13:27-29, Fig. 7. The light input ports are included in an "otherwise smooth surface." *Id.*, 12:24-27; *see also* 13:52-62, 14:26-28. The figures depict the same. *See* Figs. 1, 7, 11-18.

ASUSTeK's proposed construction is also consistent with the dictionary definition of "grooves." Ex. 39 (https://www.merriam-webster.com/dictionary/groove) (defining "groove" as "a long narrow channel or depression"); Ex. 40 (https://www.dictionary.com/browse/groove) ("a long, narrow cut or indentation in a surface"); *see also Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("A court … may rely on dictionary

definitions, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" (quoting *Phillips*, 415 F.3d at 1318)).

Specifically, during prosecution of his other patents, the inventor stated: "***in plain meaning, a groove represents a long, narrow cut, channel or depression in a surface.***" Ex. 37 ('826 Patent File History), 8/9/2014 Response to Office Action, p. 6. The prior art ("Vasylyev[19]"), included such grooves "spaced apart by smooth, non-textured portions of the surface," while the claim recited "surface corrugations," which "introduce surface waviness with well-defined peak and valleys. *Id.*; *see also* Ex. 25 ('007 Patent File History), 8/8/2015 Response to Office Action, p. 23 (citing to definition from dictionary.com and describing "grooves as being depressions in otherwise smooth and planar surface"). *see also* Ex. 38 ('007 Patent File History), 8/27/2014 Response to Office Action, p. 20-21 ("[I]n plain meaning, a groove represents a long, narrow cut, channel or depression in a surface. … A groove formed in a surface does not generally redefine the planarity of the surface[.]"). Accordingly, the inventor himself has both distinguished surface corrugations from grooves and provided an express definition of "grooves." *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1358–59 (Fed. Cir. 2017); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). His statements should be given effect.

Accordingly, the Court should construe "linear grooves" as "long, narrow cuts, channels or depressions in an otherwise smooth surface, as opposed to a corrugated surface."

**L.    "configured to" / "configured for"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| RE'630 Patent: 17, 18, 25 '135 Patent: 1, 5, 6, 11 | "specifically made to / for … not merely capable of …" | Plain and ordinary meaning. |

---

[19] "Fig. 23A of Vasylyev" refers to the application which issued as the '007 Patent (the parent patent to 4 of the other asserted patents in this case).

| | | |
|---|---|---|
| '342 Patent: 1, 3, 7, 9, 13, 15, 24, 25, 29, 33<br>'7562 Patent: 1, 6, 7, 8, 13, 14, 19, 20<br>'306 Patent: 2, 17, 18, 19, 21, 27, 28, 38<br>'089 Patent: 14, 18, 19<br>'157 Patent: 1, 9, 14<br>'475 Patent: 1, 9, 14, 22, 25<br>'088 Patent: 26<br>'951 Patent: 1, 17, 18<br>'085 Patent: 1, 19<br>'2562 Patent: 1, 3, 4, 18<br>'794 Patent: 1, 11, 17, 19, 20<br>'093 Patent:1, 12<br>'197 Patent: 1, 3, 4<br>'340 Patent: 1, 11, 14<br>'621 Patent: 1, 19, 25, 26<br>'397 Patent: 1, 19 | | Alternatively, "capable of" |

ASUSTeK's construction is consistent with the intrinsic evidence, including the patentee's express understanding of the phrase "configured to." In contrast, SVV proposes a construction directly contrary to this understanding.

Specifically, during prosecution of the parent to the RE'630 Patent, the patentee stated[20] that "the term '**configured to**' … necessitates that the [structures] are **specifically made** to [perform the recited function] which is a narrower limitation compared to a mere capability of [performing the function]." Ex. 41, RE 492 File History (12/6/2019 Response After Final), pp. 7-8 (emphasis in original). The patentee distinguished the prior art because "the mere [ ] capability of this [prior art] device is insufficient to conclude that [the prior art] teaches [structures] that are **configured to** [perform the function]." *Id*. (emphasis in original). Indeed, the inventor even cited to Federal Circuit precedent and a dictionary definition to confirm his understanding that "the term '**configured to**' has the narrower meaning than the term '**capable of**.'" *Id.* (emphasis in original); *see also* Ex. 42 (RE 492 File History), 3/9/2020 Appeal Br., pp. 14, 21-22 (same); Ex. 43, 6/9/2020

---

[20] It is worth noting here that the inventor, Sergiy Vasylyev, prosecuted the patents himself.

Reply Br., pp. 13 ("*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, No. 11-1147 (Fed. Cir. Mar. 14, 2012), a reference which cannot be ignored. Furthermore, a widely accepted dictionary definition of the word 'configure' means '[t]o design, arrange, set up, or shape with a view to specific applications or uses.'" (citing to dictionary definition)). The patentee's intent and understanding of the phrase "configured to" could not be clearer and should be given full effect. *GE Lighting Sols., LLC v. AgiLight, Inc*., 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'").

Based on the foregoing, the Court should construe "configured to" / "configured for" as "specifically made to / for … not merely capable of …." *See Barkan Wireless IP Holdings, L.P. v. Sprint Commc'ns Co., L.P*., No. 2:19-CV-336-JRG, 2020 WL 6271162, at *34 (E.D. Tex. Oct. 26, 2020) (construing "adapted to" to mean "configured to" with the "understanding … that 'adapted to' does not encompass mere capability"); *SIPCO, LLC v. ABB, Inc*., No. 6:11-CV-48, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012) ("Interpreting 'configured to' as requiring only mere capability would eliminate any meaningful limits to the claims."); *Solocron Media, LLC v. Verizon Communications Inc*., 2015 WL 1011310, *12 (E.D. Tex. March 5, 2015) (according "configured to" its plain meaning, "which the Court understands to require not merely being capable of being configured but rather being actually configured.").

## M.    "indirectly in contact with"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '085 Patent: 1, 19<br>'2562 Patent: 1, 18<br>'093 Patent: 1<br>'794 Patent: 1, 19, 20 | "physically bonded or adhered to."<br><br>Alternatively, indefinite. | Plain and ordinary meaning. |

The claims each require that a "substantial portion of the major surface [of a flexible printed circuit]" be "directly or indirectly in contact with" a broad-area surface of a light transmissive sheet. The concept of direct contact is well-known—when two objects touch, they are "directly in contact with" each other. However, the plain and ordinary meaning of indirect contact between physical objects on its own makes no sense. The '085 Patent's specification provides only one possible example of what "indirect contact" could mean. If "indirect contact" does not carry this meaning, the term is indefinite. *Lebby Decl.*, ¶¶71-74.

The only possible meaning of "indirect contact" in view of the specification is that the major surface can be "bonded to" the transmissive sheet using an adhesive or encapsulant. '085 Patent[21], Abstract, 34:11-17, 34:31-45 (describing LEDs "mounted/bonded to waveguide" using adhesive or encapsulant to form "an integrally formed, single piece illumination system"), 35:26-33, 48:41-44 (describing a side-emitting LED strip with an "adhesive backing" "used for attaching the strip to" a surface of the waveguide), Figs. 37, 39, 58. This would mean the two physical objects are not "directly" in contact but rather are "indirectly" in contact via bonding. The specification does not ever use the phrase "indirectly contact" or otherwise describe indirect contact other than through bonding or adhering. Thus, ASUSTeK's construction is warranted. *Lebby Decl.*, ¶72.

In the absence of this construction, "indirectly in contact" is indefinite as it lacks any objective boundaries as to what it means for an object to be "indirectly in contact with" another object. *Lebby Decl.*, ¶73. For example, what if an air gap exists between the two objects? What if that airgap is formed by supports that are touching the two objects? What if there a layer or object completely between the two objects? What if there are two layers? Or 5 layers? A POSITA would

---

[21] The '085, '2562, '093, and '794 Patents are continuations of U.S. Patent No. 11,035,993 and share a common specification. Citations will only be made to the '085 Patent.

have no waying of knowing the answer these questions in view of the specification. *Id*. Thus, a POSITA would not understand the scope of this claim any reasonable certainty. *Id*., ¶74. Accordingly, if the Court does not adopt ASUSTeK's construction, it should find these claims invalid as indefinite. *See Nautilus*, 572 U.S. at 910.

### N.    "highly transparent optical windows"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '397 Patent: 1 | "surface portions that are more transparent than the corrugated surface"<br><br>Otherwise, "highly transparent" is indefinite. | Plain and ordinary meaning. |

Claim 1 of the '397 Patent requires both "a generally planar layer of **optically transparent** material" and a "corrugated surface including **highly transparent optical** windows." The Court should adopt ASUSTeK's proposed construction because it is consistent with the claim language and specification. If "highly transparent optical windows" does not carry this construction, it is indefinite as an unbound term of degree.

The '397 Patent explains that optical windows are "configured for inputting light to or from the transparent layer" having a corrugated surface and "surface portions that are either free of the surface corrugations or where the corrugated relief is suppressed." '397 Patent, Abstract, 2:38-41, 9:6-8, 9:13-18, 2:61-64. The optical windows have "different light bending properties compared to the rest of the corrugated surface" and "allow[] the incident light to pass through the windows in either direction." *Id*., 7:14-17, 8:45-48. In contrast, the surface corrugations have a "retroreflective surface for confining light below the surface" using total internal reflection. *Id*., 2:38-41, 7:63-8:5, 9:13-18. Exemplary optical windows include openings in the corrugations and surfaces relief features, such as cavities, prismatic grooves, holes, surface discontinuities, etc. *Id*., 7:43-48, 12:8-15, Figs. 1-4, 7-13, 28-29. The optical windows "are essential for the proper input

of light into layer 8." *Id.*, 10:20-22.

Thus, a POSITA would have understood that because the optical windows are configured to allow light to pass in either direction, they are more transparent than the corrugated surface. The Court's construction should reflect this difference between the two components. *Lebby Decl.*, ¶69.

To the extent ASUSTeK's construction is not adopted, "highly transparent" is indefinite as a term of degree. *Lebby Decl.*, ¶¶68-70. The specification does not use the phrase "highly transparent" outside of the claims and does not describe the transparency of the optical windows other than as described above. As such, the specification provides no objective standard for ascertaining the scope of this term of degree. *See Biosig Instruments*, 783 F.3d at 1378.

Thus, in line with this Court's reasoning in *U.S. Well Services* which held the term "high pressure" to be indefinite as an improper term of degree, "highly transparent" is similarly indefinite. *U.S. Well Servs., Inc. v. Halliburton Co.*, No. 6:21-cv-00367-ADA, 2022 WL 819548, Dkt. No. 74, at *5-10 (W.D. Tex. Jan. 17, 2022) (finding "high pressure" indefinite "for failing to inform with reasonable certainty, those skilled in the art about the scope of the invention"); *Via Transportation Inc. v. RideCo Inc.*, No. 6:21-cv-457-ADA, Dkt. 67 at 2 (finding "high demand area" indefinite). In a case also involving waveguides, the Eastern District of Texas found a claim requiring a "highly modulated surface" indefinite "because the claims and specification fail to provide an objective standard to determine whether [] a surface is 'highly' modulated." *Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*, No. 6:11-CV-011, 2012 WL 2872121, at *12-14 (E.D. Tex. July 12, 2012) (finding claims indefinite because the claims and specification fail to provide an objective standard to determine whether the [] surface of waveguide is "highly" modulated). Other district courts have similarly found terms of degree such as "high" to be indefinite under similar circumstances. *See Selex Commnc's, Inc. v. Google Inc.*, No. 1:09-cv-

02927-TWT, 2013 WL 1412334, at *14 (N.D. Ga. Apr. 8, 2013) (finding claim indefinite because "with respect to 'high cost number,' there is no standard by which a person having ordinary skill in the art could determine with a degree of certainty that a dialed number is a 'high cost number'"); *Jaguar Land Rover Ltd., v. Bentley Motors Ltd.*, No. 2:18-CV-320, 2020 WL 7010227, at *15-18 (E.D. Va. 2020) (finding claim limitation "the brake subsystem is arranged to allow a relatively high degree of wheel slip under braking" was indefinite because it was a term of degree and the specification "does not provide any objective bounds around what qualifies as a 'relatively high' degree of wheel slip, or whether the degree of wheel slip can become so high that it no longer qualifies as 'relatively high'"); *Signal IP v. Am. Honda Motor Co.*, No. LACV: 14-02454 JAK JEMX, 2015 WL 5768344, at *53-56. (C.D. Cal. Apr. 17, 2015) (finding the term "threshold torque range indicative of conditions of relatively low vehicle torque demand" indefinite where the term was defined the term in circular language, and the specification did not help define the boundaries of "relatively high" and "relatively low"); *Semcon IP Inc. v. Huawei Device USA Inc.*, No. 2:16-CV-00437-JRG-RSP, 2017 WL 2972193, at *24-25 (E.D. Tex. 2017) (finding the term "relatively short messages" was indefinite because the patent did not provide objective guidance was to what was "short" but only contrasted it with "inordinately long").

Accordingly, absent ASUSTeK's proposed construction, the term "highly transparent" is indefinite. *Lebby Decl.*, ¶¶67-70.

### O.    "receive light"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '135 Patent: 1<br>'7562 Patent: 14, 20<br>'306 Patent: 17 | "the surface first receiving light upon light entrance into an object" | Plain and ordinary meaning. |

During prosecution of the '007 Patent, the inventor expressly defined what "receive light"

means. Ex. 25 ('007 Patent[22] File History), 8/8/2015 Office Action Response, p. 17. Specifically, the inventor stated that "'receive light' should be interpreted in view of the specification and the plain meaning" as "***the surface first receiving light upon light entrance into an object***." *Id.* the inventor's express definition mandates construction of this definition in the patents at issue here. *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1345-46 (Fed. Cir. 2013) (finding definition from patentee in prosecution history mandated narrower construction than the plain and ordinary meaning); *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Accordingly, ASUSTeK's construction should be adopted because the inventor clearly ascribed a definition to the phrase "receive light." *GE Lighting Sols., LLC v. AgiLight, Inc*., 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" (internal citations omitted)).

Further, the inventor distinguished the prior art on the grounds that an edge of the prior art light guide did not "receive light" first; instead, the light was first received by a major surface and the light only reached the edges after first having entered the light guide. Ex. 25 ('007 Patent File History), 8/8/2015 Office Action Response, p. 17 ("Although the lights received via the top major surface are shown further traveling in the waveguide of [the prior art] and striking various edges of the waveguide within its body, it cannot be reasonably said that the [prior art] waveguide is configured to receive light on any of such edges since light strikes the edges from inside the waveguide."); *see also* Ex. 38 ('007 Patent File History), 8/27/2014 Response to Office Action, p. 18 (describing that the "[prior art]'s waveguide is configured to receive light on its broad-area

---

[22] The '135 and '7562 Patents claim priority to the '007 Patent as continuations. The '306 is a continuation-in-part of the '007 Patent and both claim priority to U.S. Provisional Application No. 61/214,331.

surface rather than on its edge" which "redirect light which is received by the waveguide on that front surface"). Thus, a surface that "receives light" is the surface that light contacts when it first enters an object, such as a waveguide. Because the inventor disclaimed subsequent reception of light by a surface (as opposed to the first time light enters an object) from the "receive light" limitations here the Court should adopt ASUSTeK's construction. *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1358-59 (Fed. Cir. 2017) *Cap. Mach. Co., Inc. v. Miller Veneers, Inc.*, 524 F. App'x 644, 649 (Fed. Cir. 2013).

**P.    "substantially smaller" / "substantially greater" / "substantially shorter"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '342 Patent: 1, 19, 28 '135 Patent: 1 | Indefinite. | Plain and ordinary meaning. |

The '135 and '342 Patents[23] fail to provide any standard or objective boundaries as to whether one thing is "substantially smaller/greater/shorter" than another thing from which a person of skill can determine the scope with reasonable certainty. Thus, these terms are indefinite.[24] *Nautilus*, 572 U.S. at 910; *Biosig*, 783 F.3d at 1378; *see also Lebby Decl.*, ¶¶52-66. These phrases will be addressed in turn:

*"Substantially Smaller"*

This phrase appears in the following claim limitation: "wherein the area of each of said plurality of light deflecting elements is ***substantially smaller*** than the light receiving aperture of each of said plurality of elongated cylindrical lenses." '342 Patent, Claim 1. The '342 Patent states

---

[23] The '135 Patent is a continuation in a chain with the '342 Patent and, therefore, shares a specification. Therefore, citations will only be made to the '342 Patent.

[24] During prosecution of the '306 Patent, which also claims priority to the '007 Patent and a common provisional application as the '342 and '135 Patents, the examiner found that the term "substantially less" was indefinite. Ex. 44 ('306 File History), 12/27/2019 Office Action, pp. 2-4, 9-10. In response, the inventor deleted the term from the claims. Ex. 45 ('306 File History), 12/30/2019 Response to Office Action, p. 12.

that "[i]t is an important aspect of the present invention that the working area of light deflecting means 14 is substantially smaller than the entrance aperture of the respective focusing means 6 illuminating said deflecting means 14." '342 Patent, 16:34-38. *see also* 20:61-65, 32:62-66, 33:8-11, 37:15-20, 48:65-49:2, 49:11-14. In another instance, "[i]t should be understood that the individual grooves 14 should preferably be *substantially smaller* in size than the width of each respective lenslets 6 toward improving collimating efficiency." '342 Patent, 41:36-40; *see also* 20:61-65, 32:62-66, 33:8-11, 37:15-20, 48:65-49:2, 49:11-14. However, this statement merely repeats the substance of the claim or an impact and provides no guidance on how to measure whether something "substantially smaller" than another thing. *Datanet LLC*, No. 6:22-CV-001142-OLG-DTG, 2023 WL 7545234, at *10 (W.D. Tex. Nov. 10, 2023) (finding that "essentially repeat[ing] the claim language" does not "provide[] a POSITA guidance to determine" the term's meaning). While the above quote references Fig. 27, the specification states in the immediately preceding sentence, "[t]he size of prismatic grooves 14 is exaggerated for clarity in the illustrations discussed above." '342 Patent, at 41:34-35; *see also* 20:55-57, 20:61-66, 22:8-10, 41:41-46. Accordingly, the figures also do not provide any objective boundaries to determine the relevant size of the light deflecting elements. Any standard or an example of a percentage considered "substantially smaller" is glaringly lacking, and "substantially smaller" is indefinite. *Lebby Decl.*, ¶¶53-56.

### "*Substantially Greater*"

- wherein at least some of said light deflecting elements are spaced from each other by a distance that is ***substantially greater*** than the size of individual light deflecting elements ('342 Patent, Claim 19)
- wherein an area occupied by each of the linear cylindrical lenses is ***substantially greater*** than an area occupied by each of the plurality of the discrete light extracting surface relief features ('135 Patent, Claim 1)

"Substantially greater" is only used once in the specification of the '342 Patent, and it is

not connected to the relevant claim language "linear cylindrical lenses" and "the plurality of the discrete light extracting surface relief features." '342 Patent, 14:54-58. This reference relates to the area of the waveguide surface relative to its walls and therefore, provides no boundaries from which the scope can be determined. The specification also refers to prismatic grooves "spaced from each other by a distance which is generally substantially larger than the receiving aperture of each prismatic groove." *Id.*, 39:28-32. Again, the prismatic grooves of the figures 26 and 27 are "exaggerated for clarity" (*id.*, 41:34-35) and, therefore, are not helpful to determining the scope.

Additionally, Fig. 20 is the only figure that shows *discrete* light extracting surface relief features required by claim 1 of the '135 Patent. '342 Patent, Fig. 20. However, the figure fails to show cylindrical lenses, preventing a POSITA from even attempting to determine the extent of "substantially greater" in the context of the claim language. *Lebby Decl.*, ¶¶57-63. Based on the foregoing, "substantially greater" is indefinite. *Id.*

### "*Substantially Shorter*"

This phrase appears in the following claim limitation: "wherein each of said plurality of elongated cylindrical lenses has an effective focal length that is ***substantially shorter*** than the dimensions of said three dimensionally textured and planar surfaces." '342 Patent, Claim 28. "Substantially shorter" is used twice in the '342 Patent's specification to denote the claim requirement that each lens must have "an effective focal length … substantially shorter than the dimensions of [the three dimensionally textured and planar surfaces]." *Id.*, 14:13-16, 37:34-36. Again, repeating claim language does not provide a POSITA with the necessary guidance to determine a term's meaning. *Datanet*, 2023 WL 7545234, at *10. Moreover, a POSITA would not find any other guidance in the specification from which the scope of this term could determined with reasonable certainty. *Lebby Decl.*, ¶¶64-66. Accordingly, "substantially shorter" is indefinite.

**Q.    "planar lens array" / "planar array" / "planar microstructured surface" / "planar surface" / "planar reflective surface"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '342 Patent: 1<br>'135 Patent: 19, 24<br>'7562 Patent: 14 | "planar" means "including a flat two-dimensional quality" | Plain and ordinary meaning. |

The inventor has expressly stated what "planar" means in the context of his inventions. Specifically, during prosecution of the '342 Patent[25], the inventor stated: "The ordinary meaning of the term 'planar' is 'of or relating to a plane: lying in one plane … having a flat two-dimensional quality.'" Ex. 46 ('342 File History), 7/14/2016 Office Action Response, p. 2 (citing Webster's dictionary); Ex. 24 ('342 File History), 10/15/2017 Office Action Response, pp. 14 (same). This does not include, like the prior art, a surface including a "regular array of … [features] having sloped sides, positioned side by side and covering the entire area of surface." Ex. 24 ('342 File History), 10/15/2017 Office Action Response, pp. 15. Such a surface "cannot be regarded as planar." *Id*.; *see also* Ex. 23 ('342 File History), 12/28/16 Office Action Response, pp. 5-6. This is consistent with the specification and figures of the '342 Patent. *See* '342 Patent, Figs. 2-14.

Accordingly, ASUSTeK's construction should be adopted because the inventor clearly ascribed a definition to the term "planar." *See GE Lighting*, 750 F.3d at 1309.

**R.    "focal area[s] / "effective focal area"**

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '342 Patent: 6, 10, 23<br>'7562 Patent: 5 | <u>focal area</u>: Plain and ordinary meaning. Alternatively, "an area where light rays would converge if a lens is illuminated by a beam of light" | <u>focal area</u>: "an area where light rays would converge if a lens is illuminated by a beam of light, and may include areas at a relatively small distance from the "ideal" focus of the lens" |

---

[25] The '135 and '7562 Patents claim priority to the '342 Patent

|  | effective focal area: "the focal area of a lens in a given material that is not air" | effective focal area: "the resulting focal area obtained when a given material occupies the space between the lens and the focal plane" |
| --- | --- | --- |

The parties previously agreed to SVV's proposed constructions, but those constructions include the ambiguous (and arguably indefinite) terms, such as "relatively small distance" and "ideal focus," and do nothing to aid the jury in understanding the term. Thus, ASUSTeK proposes that "focal area" be given its plain and ordinary meaning. Absent such a construction, "focal area" should be construed similar to the previously agreed-upon construction but remove the phrase that creates confusion and validity issues. ASUSTeK realizes that this phrase is taken from the specification (*see* '342 Patent, 14:3-12), but it only serves as an example of the agreed-upon portion and, therefore, is not necessary or helpful for the stated reasons.

As to "effective focal area," the specification explains that it is "different if a different material separates lens 6 and its focal area." '342 Patent, 37:43-46, 14:23-26. "By way of example, for the same parameters of lens 6, its focal distance can be longer in PMMA material than in the air due to the difference in refractive indexes." *Id.*, 37:46-48, 14:26-30. However, the claim does not contemplate air between the lenses and light deflecting elements/surface relief features, instead they are formed in the optically transmissive material, which is not air. *See* '342 Patent, Claim 1, '7562 Patent, Claim 1. ASUSTeK's construction should be adopted.

## S.    "focal plane"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
| --- | --- | --- |
| '342 Patent: 20<br>'306 Patent: 1, 20, 33 | "a plane that is perpendicular to the optical axis of a lens or mirror and passes through the focus" | "a plane that is perpendicular to the axis of a lens or mirror and passes through the focus" |

ASUSTeK proposes further construction of the previously agreed construction to avoid

ambiguity. Namely, the previous construction includes the phrase "axis of a lens or mirror" without reference to *which* axis. In other words, the previous construction would improperly encompass *any* axis, when the specification confirms the correct axis is the "optical axis." Namely, the specification describes that reflecting/deflecting means are disposed in a "focal plane" of a lens, with the focal plane being perpendicular to the "optical axis." '342 Patent, 18:67-19:3 ("With the lens array being planar and individual lenses having an identical optical configuration, the plurality of foci of individual reflecting means 6 provides a common focal plane disposed at a distance from lens array 5."), 39:55-66 ("[T]he light collected by lens 6 is collimated into a generally parallel beam propagating along the optical axis of lens 6. When each of the lenses 6 forming lens array 5 has an optical axis perpendicular to the lens array 5 and the matching prismatic groove 14 is disposed on the optical axis lens array 5 will form an array of collimated beams propagating away from it and perpendicular to its surface."); *see also* 19:58-61, 20:3-5, 38:19-23, Figs. 3, 24, 26; *see also* '306 Patent, 3:40-46, 13:52-56, 17:61-64, Figs. 18, 21. Indeed, the focal plane is "disposed at a distance from the lenses," not at the lens as it could be if "axis" were interpreted as the vertical axis of the lens. '306 Patent, Claim 1. Thus, the Court should adopt ASUSTeK's construction.

### T. "optical waveguide"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '135 Patent: 24<br>'RE630 Patent: 17, 18, 21, 22, 23<br>'085 Patent: 1, 19<br>'093 Patent: 1, 11, 12 | Plain and ordinary meaning. | "a structure that confines light within it at one or more optical boundaries, so the light can propagate along the length of the structure" |

SVV proposes a construction for this term that is easy to understand on its own—it is a structure that guides optical waves in one direction. *See* https://en.wikipedia.org/wiki/Waveguide_(optics); Ex. 47 ("An optical waveguide is defined as a

structure that guides electromagnetic waves, particularly light, with minimal energy loss by confining the transmission of energy in one direction."). There is no need to confuse the jury with additional, unhelpful words to describe such a straightforward term.

### U. "LED strip" / "flexible side-emitting LED strip"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '794 Patent: 1, 2, 7, 15, 16, 19, 20, 21, 25<br>'621 Patent: 1<br>'093 Patent: 1, 2, 8, 13, 16-19<br>'2562 Patent: 1, 13, 14, 15, 18,<br>'085 Patent: 1, 14, 15, 16, 19, 27 | Plain and ordinary meaning. | LED strip: "a lighting assembly that includes a substrate which length is substantially greater than its width, and also includes a row of Light Emitting Diode (LED) packages mounted on that substrate along its length and contains conductors that supply power to the LEDs."<br><br>flexible side-emitting LED strip: "an LED strip which includes side emitting LED packages and can be flexed or bend with relative ease without breaking." |

Each of the claims already describes the arrangement of components of a "LED strip," which includes a flexible printed circuit, an array of side-emitting LED packages, and plurality of electrical contacts. The claims further require that the LED packages are "arranged along a length dimension" and "mounted to a major surface" of the "printed circuit" and that the LED packages include "electrical contacts configured for electrically connecting the LED strip to a power supply." SVV's constructions simply re-state these requirements. There is no need to construe terms to include requirements already recited by the claims themselves. *See VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 653 (Fed. Cir. 2022) (noting that "a construction that introduces redundancy into a claim is disfavored"); *Apple, Inc. v. Ameranth, Inc*., 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant.").

In addition, SVV's constructions inject subject terminology, such as "substantially greater" and "relative ease" for which there is no guidance in the specification from which a POSITA could determine the scope of the invention with reasonable certainty. *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("[A] claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term."). The Court should reject SVV's construction and afford these terms their plain and ordinary meaning.

### V. "side-emitting LED packages"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '794 Patent: 1, 4, 8, 9, 16, 19-21, 24<br>'621 Patent: 1, 12, 18-21, 25, 26<br>'093 Patent: 1, 9, 10, 16-20<br>'2562 Patent: 1, 16, 18<br>'085 Patent: 1, 17, 19, 26<br>'340 Patent: 1, 13-16<br>'197 Patent: 1, 5, 6, 8, 18 | Plain and ordinary meaning. | "a light-emitting diode (LED) unit whose principal light-emitting opening is located on a side face of the package and lies in a plane oriented generally perpendicular to the package's mounting surface." |

The claims of these patents each already require that the "light emitting surface" of the "side-emitting" LED package be "oriented perpendicular to the major surface" of the printed circuit. Again, absent a compelling reason, it is disfavored to introduce redundancy into the claim language through a construction. *See VLSI*, 53 F.4th at 653. This term should be afforded its plain and ordinary meaning.

### W. "printed circuit"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '794 Patent: 1, 19, 20 | Plain and ordinary meaning. | "a component that provides electrical connections for electronic parts mounted on it and includes conductive tracks laid out on an insulating base material" |

A "printed circuit" is a well-known component of most electronic devices and has the

generally understood meaning of "a circuit for electronic apparatus made by depositing conductive material in continuous paths from terminal to terminal on an insulating surface." *See* Ex. 48 (https://www.merriam-webster.com/dictionary/printed%20circuit); Ex. 49 (https://www.dictionary.com/browse/printed-circuit). This term should be afforded its plain and ordinary meaning.

### X.  "light mixing area"

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '794 Patent: 1, 5, 11, 15, 16, 19, 20 | Plain and ordinary meaning. | "a region in which light from different LEDs overlaps spatially and angularly before being extracted from the waveguide" |

The claims already define the boundary of the "light mixing area"–it is an area "located between the first edge and the patterned light extraction area." *See* '794 Patent, Claim 1. There is no reason to construe this phrase any further." Moreover, SVV's proposed construction would potentially, and improperly, include the entire area of the waveguide as the light mixing area, where the claim language makes it clear that the light mixing area is something less than the entire waveguide. The Court should find that "light mixing area"—an easily understood phrase in view of the claim language— has its plain and ordinary meaning.

### Y.  Whether '088 Patent (claims 1, 3, 7, 8, 10-12, 18-19, 21-22, 24-26) and '089 Patent (claims 1, 2, 4-5, 7-10, 12-14, 16-20) preambles are limiting

| Patent: Claim(s) | ASUSTeK's Proposed Construction | SVV's Proposed Construction |
|---|---|---|
| '088 Patent: 26<br>'089 Patent: 14, 17-20 | The claims only read on light trapping/collecting systems and not illumination systems. | Preambles not limiting |

ASUSTeK incorporates by reference its arguments in Section E.

Dated: September 12, 2025

Respectfully submitted,

By: /s/ Mark C. Lang
    Eric A. Buresh
    eric.buresh@eriseip.com
    Michelle L. Marriott
    michelle.marriott@eriseip.com
    Chris R. Schmidt
    chris.schmidt@eriseip.com
    Mark C. Lang
    mark.lang@eriseip.com
    **ERISE IP, P.A.**
    7015 College Blvd., Suite 700
    Overland Park, Kansas 66211
    Telephone: (913) 777-5600
    Facsimile: (913) 777-5601

    Mark D. Siegmund
    State Bar No. 24117055
    Email: msiegmund@cjsjlaw.com
    **CHERRY JOHNSON SIEGMUND JAMES, PLLC**
    400 Austin Ave., Ste. 903
    Waco, Texas 76701
    Telephone: (254) 732-2242
    Facsimile: (866) 627-3509

    *Attorneys for Defendant ASUSTeK Computer Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on September 12, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

/s/ *Mark C. Lang*
Mark C. Lang
